## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | |
|---|---|
| CLIFFORD SAM GIBBONS, | No. |
| Plaintiff, | |
| | COMPLAINT and |
| v. | JURY DEMAND |
| MONY LIFE INSURANCE COMPANY and DISABILITY MANAGEMENT SERVICES, INC., | |
| Defendants. | |

### VERIFIED COMPLAINT FOR DECLARATORY AND OTHER RELIEF

Clifford Sam Gibbons ("Gibbons" or "PLAINTIFF"), by and through his attorneys, Pellis Law Group, LLP, for his Complaint ("Complaint") against MONY Life Insurance Company ("MONY") and Disability Management Services, Inc. ("DMS") (collectively, "Defendants"), states and alleges as follows:

### NATURE OF THE ACTION

1.      In this insurance coverage action, PLAINTIFF seeks, *inter alia,* a declaration of his rights under a Disability Income/Residual Income Loss Policy, Policy No. 90X1-06-93 O (the "Policy"), sold to PLAINTIFF by MONY Field Underwriter (Licensed Resident Agent) John Skryd ("Skryd"), issued to PLAINTIFF by MONY, and presently administered by DMS, a policy which was designed to provide a designated monthly disability income payment to PLAINTIFF in the event he became disabled during the life of the Policy.  PLAINTIFF also seeks reformation of his Policy based upon MONY and Skryd's failure to provide the comprehensive "lifetime benefit" that both PLAINTIFF and MONY Agent Skryd specifically

requested. In addition, PLAINTIFF alleges that Defendants are guilty of unreasonable and vexatious delay in their handling of his claim and their refusal to pay disability benefits to PLAINTIFF, and that PLAINTIFF is entitled to recover penalties and attorneys' fees pursuant to Section 155 of the Illinois Insurance Code, 215 Ill. Comp. Stat. Ann. 5/155 (West 2015).

2. This action arises out of the wrongful refusal of Defendants to provide a "lifetime benefit" under the disability insurance Policy sold to PLAINTIFF, despite PLAINTIFF's persistent, repeated, and clear written and oral instructions to MONY Agent Skryd to procure benefits that, once triggered by disability, would be payable for PLAINTIFF's lifetime.

3. For almost two years prior to filing this action, and in an effort to provide Defendants with information substantiating his disability, PLAINTIFF expended considerable time and effort to meet, confer, and communicate with Defendants, as well as produce documents, medical reports, attend medical exams, and provide other information responding to DMS' repeated demands for irrelevant claim investigation information.

4. Defendants' conduct during this period of time, when viewed in its totality and frequency, was reprehensible, forcing Gibbons and his wife to respond to repeated requests for irrelevant information and to engage in heated exchanges over mischaracterizations of the Policy's requirements and language.

5. In anticipation of PLAINTIFF's 65th birthday on September 10, 2015, PLAINTIFF's counsel reached out to DMS to confirm that Gibbons' "lifetime" disability benefits would continue well beyond his upcoming 65th birthday.

6. In response, Defendants expressly rejected the existence of a lifetime benefit that would extend Gibbons' disability benefits past his 65th birthday.

7.      As a result of Defendants' harassment in claims handling and wrongful refusal to provide the expected lifetime coverage, Gibbons has incurred significant legal fees to pursue coverage, including forcing him to bring this action to procure the insurance coverage that he specifically requested from MONY via its agent, Skryd.

8.      PLAINTIFF now seeks, *inter alia*, reformation of the Policy and a declaration from this Court that MONY is required to continue to pay Gibbons the full Policy benefits for his lifetime, as well as additional damages resulting from Defendants' unreasonable denial of coverage.

## THE PARTIES

9.      PLAINTIFF Clifford Sam Gibbons is a natural person residing at 1536 Poplar Place, McLean, Virginia.

10.      PLAINTIFF is happily married to his wife of twenty-five years, and together they have two college-aged sons.

11.      The Mutual Life Insurance Company of New York (MONY's predecessor), was incorporated in New York, New York, in 1842, making MONY the oldest continuous writer of insurance policies in the United States.

12.      On November 16, 1998, The Mutual Life Insurance Company of New York converted from a mutual life insurance company to a stock-owned company, The MONY Group, Inc.

13.      In 1996, MONY executed a definitive reinsurance agreement with Centre Life Reinsurance Limited ("Centre Re") of Bermuda, an insurance and reinsurance company owned by Zurich Insurance Group, Ltd., a financial services company based out of Switzerland.

14.     Defendant DMS is a third party administrator that services insurance products, currently manages the Gibbons' MONY Disability Policy, and was hired by MONY in 1996 to infuse adversarial claims confrontation and, with a bonus compensation incentive, not pay claims.

15.     Effective December 31, 1997, Centre Re reinsured Gibbons' MONY Disability Policy and assumed the financial obligations for the policy and these reinsurance obligations remain in place today.

16.     In 2001, DMS completed its conversion of the MONY's individual Disability Income insurance policy data from MONY's mainframe system to DMS' fully integrated policy and claim administration system. DMS' system supports the day-to-day servicing of over 70,000 MONY policies.

17.     On July 8, 2004, MONY continued its dissolution and became a wholly owned subsidiary of a foreign owned insurance company, AXA Financial, a multinational investment banking firm based in Paris, France.

18.     On October 1, 2013, AXA completed its divesture of MONY to Protective Life Corporation.

19.     In February 2015, Protective Life Corporation was sold to Dai-ichi Life Insurance, of Japan for $5.7 billion.

20.     At present, MONY, upon information and belief, is an insurance company incorporated in and with its corporate headquarters and principle place of business located in New York, and is a wholly owned subsidiary of Protective Life Insurance Company and Dai-Ichi Life Insurance of Japan.

21.     Protective Life Insurance Company, upon information and belief, is a life, annuity, and accident insurance company, incorporated in Tennessee, with its corporate headquarters and principle place of business located in Alabama.

22.     DMS is an independent, third-party administration and consulting firm, specializing in the management of individual and group disability products and, upon information and belief, is a Massachusetts corporation with its corporate headquarters and principle place of business located in Massachusetts.

### JURISDICTION & VENUE

23.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(1), which provides, in relevant part, that "the district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000, exclusive of interest and costs, and is between – Citizens of different States…."

24.     Jurisdiction is proper under 28 U.S.C. § 1332 because, as is outlined above, there is complete diversity of citizenship between PLAINTIFF and Defendants, and the amount in controversy exceeds the sum of $75,000.

25.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), which states, in relevant part, "A civil action may be brought in – a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred...."

26.     The events giving rise to the claims set forth in this action occurred at, or were directed from, the offices of MONY's agent, John Skryd, located in Glen Ellyn and Naperville, Illinois, both of which can be found within DuPage County, which falls within the Northern Judicial District of Illinois' Eastern Division.

## FACTUAL ALLEGATIONS

**A.    The Policy**

27.    MONY issued the Policy to Gibbons, and the term commenced on September 1, 1990.  The Policy continues in full force and effect today.  A true and correct copy of the Policy is attached hereto and made part of this Complaint as Exhibit A.

28.    Gibbons paid in full and always on time, with after-tax income for twenty-five years (25), the total monthly premium charged by MONY in exchange for the disability insurance coverage, including the "lifetime benefit" coverage he specifically requested from MONY's Field Underwriter (Licensed Resident Agent), Skryd, as is more fully described herein.

29.    Prior to the issuance of the Policy on September 1, 1990, Gibbons was required to undergo a long and thorough application process, including medical examinations, laboratory tests, employment skills/duties review and documentation, compensation analysis and a rigorous underwriting process by MONY to qualify for coverage under the Policy.

30.    PLAINTIFF was introduced to MONY Agent Skryd in early January 1990 in Carlsbad, CA by the senior management of The Mutual Life Insurance Company of New York, including James Farley ("Farley"), MONY Chief Executive Officer and Chairman of the Board; Sam Foti, Senior Executive Vice President for Marketing and Sales; Lee M. Smith; Senior Vice President for Government Relations and Public Policy and other executive level officers.

31.    MONY Agent Skryd was present at this exclusive invitation only meeting of top MONY executives because Agent Skryd was highly regarded and recognized by MONY to be the leading sales Agent nationally for MONY.

32.    PLAINTIFF and Agent Skryd became acquainted after several days together at the MONY meetings in Carlsbad, CA in early January 1990.

33.    During this time period, Gibbons was outside legal and Federal Government Relations/Public Policy Washington counsel to MONY, primarily charged with optimizing MONY's legal corporate structure to minimize its overall federal tax liability and to develop congressional legislation and support for innovative tax driven life, annuity, and investment products marketed by MONY.

34.    Over the years, Gibbons' services in Washington saved MONY hundreds of millions of dollars in tax liability for the company, its affiliates and provided competitive advantages for MONY insurance and financial products.

35.    During the Policy application/underwriting process, Gibbons had both oral and written communications with MONY Agent Skryd at his MONY offices in DuPage County, Illinois regarding exactly what the Policy would cover.

36.    During the application/underwriting period lasting eight (8) months, MONY Agent Skryd provided Gibbons with information about the basic disability coverage provided by the Policy, including the Basic Monthly Income benefit payable up until age 65, in the event Gibbons suffered an Incapacity as defined within the Policy.

37.    After age 65, the Policy benefits would lapse, unless a specific "rider" was endorsed onto the Policy that extended the disability payments past Gibbons' 65th birthday.

38.    During this entire process and prior to his agreeing to purchase the Policy, Gibbons was adamant with Skryd that he would not purchase any disability policy unless the disability benefits, once triggered, covered him for his entire lifetime.

39.    During the application/underwriting process, Skryd also provided Gibbons with written information that detailed optional benefits available under the Policy, including a report prepared specifically for  Gibbons that described several optional "lifetime benefits" including a

"Lifetime Injury and Sickness Benefit Rider," a "Lifetime Benefit Period Extension Rider," and

a "Lifetime Injury or Sickness Income Benefit" (the "Explanation of Benefits Report").  A true

and correct copy of the Explanation of Benefits Report is attached hereto as Exhibit B.

40.     The Explanation of Benefits Report described the "Lifetime Injury and Sickness

Benefit Rider" as follows:

> This option is designed to help replenish what disabilities, caused by injury or
> sickness, take from your retirement, CASH.  It provides a guaranteed monthly
> income benefit beginning at age 65 and continuing for life if the coverage to
> which this rider is attached paid monthly income benefits during ages 60 through
> 64 for Incapacity and/or Residual Income Loss.
>
> The amount of your monthly income benefit, beginning at age 65, is determined
> by the amount of monthly income benefits paid by the coverage to which this
> rider is attached for disability during ages 60 through 64.
>
> You do not need to be disabled beyond age 65 to receive Lifetime Injury and
> Sickness Benefits.

41.     The Explanation of Benefits Report also outlined the other two, different "lifetime

benefit rider" options, which paid disability benefits based upon a sliding scale, depending upon

when the disability commenced.

42.     For example, the Explanation of Benefits Report outlined the "Lifetime Benefit

Period Extension Rider" stating:

> This rider is designed to provide you with Total Disability benefits starting at age
> 65, provided you become totally disabled from Injury or Sickness prior to age 55.
>
> If Total Disability commences after age 55, the monthly benefit payable at age 65
> shall be scaled down e.g. at age 60, 50% of the monthly benefit shall be payable.

43.     After receipt and review of the Explanation of Benefits Report provided by Skryd,

Gibbons sent a letter to Skryd dated May 14, 1990, that stated he was "thoroughly confused" and

stated in unequivocal terms, "I want to purchase a disability insurance policy that covers me

completely until I die for incidents that are catastrophic in nature (i.e. those events that prevent

me from earning income in my current profession).  In other words, I would like to purchase a disability plan that would pay a certain amount . . . to me as long as I am living."  A true and correct copy of Gibbons' May 14, 1990 letter to Skryd is attached hereto as <u>Exhibit C</u>.

44.     Based upon his May 14, 1990 letter and prior and subsequent communications with Skryd, Gibbons purchased the Policy with the clear understanding, expectation, and unequivocal assurances by MONY Agent Skryd that he purchased and would receive "Lifetime Injury and Sickness Benefit Rider" coverage as outlined in the Explanation of Benefits Report, or, in other words, full disability coverage for life.

45.     As part of MONY Agent Skryd's service, he filled out a MONY application on PLAINTIFF's behalf and checked-off the box entitled "Lifetime Injury & Sickness" and handwrote next to the box "LPBER" [sic][1].  A true and correct copy of the MONY application dated June 25, 1990 is attached hereto as <u>Exhibit D</u>.

46.     At the time Skryd made the notation on the application, he believed that "LPBER" was the full "Lifetime Injury and Sickness Benefit Rider" that he had agreed to procure for PLAINTIFF, which was outlined in the Explanation of Benefits Report.

47.     In fact, during the application process Skryd called the MONY disability underwriter before making the "LPBER" notation on the application, described Gibbons' repeated, unequivocal requests for full lifetime benefits, and asked the underwriter with whom he spoke which rider was appropriate to place onto the Policy.  The underwriter told Skryd to "just put LBPER" on the application.

48.     At no time did the MONY underwriting department or staff that issued the Policy ever ask MONY Agent Skryd which lifetime benefit rider he intended to place on the Policy, as there were several different lifetime benefit rider options to choose from.

---

[1] The correct acronym is actually "LBPER."

49.     On the application MONY Agent Skryd filled out on PLAINTIFF's behalf, he should have made the notation for the "Lifetime Injury and Sickness Benefit Rider," which, upon information and belief, was characterized with the acronym "LEXR." Instead, Skryd made an inaccurate notation, and as a result, an incorrect lifetime benefit rider, characterized with the acronym "LBPER," was placed onto PLAINTIFF's Policy by mistake.

50.     The Policy was delivered by Skryd from Glen Ellyn, IL to Gibbons on September 26, 1990, and included a document entitled "Disability Income Protection Coverage Outline of Coverage" that does not mention any "lifetime" benefit rider, but does contain a page entitled "Partial List of Clients and Disability Causing Loss of Income," which lists "Heart Attack" three different times as a cause of income loss.

51.     Upon receipt and review of the Policy coverage outline, Gibbons read under the heading of Schedule of Benefits and Premiums on page 3 of the Policy that a certain lifetime rider and the premium increase figure was in fact included in the Policy.

52.     Gibbons was reassured by a telephone call from MONY Agent Skryd, from his office in Glen Ellyn, Illinois on or about September 26, 1990, to confirm the Policy had been received that the disability policy that Gibbons purchased was for lifetime benefits if he were to become disabled.

53.     The Policy binder was sent along with a check for the first premium payment from Gibbons to MONY Agent Jack Skryd to his office in Glen Ellyn, Illinois.

54.     Upon receipt of the Policy, Gibbons never questioned the "lifetime" benefit in the Policy since he was continuous and repetitiously specific and clear in his request for comprehensive lifetime benefit coverage to Skryd, MONY's Agent, and relied upon Skryd, as the top MONY insurance professional, to procure the explicitly requested coverage.

55.    Upon information and belief, Skryd was the Field Underwriter (Licensed Resident Agent) who gathered information for MONY and assisted Gibbons in completing every detail of the insurance application, but neither underwrote nor issued the Policy to Gibbons. Rather, the underwriting and issuance of the Policy was done by a separate MONY office.

56.    The Policy that was actually issued to Gibbons contained not the expansive "Lifetime Injury and Sickness Benefit Rider" that Gibbons specifically requested, but rather a more limited "Lifetime Benefit Extension Rider."

57.    In addition, the "lifetime" rider that was actually included in the Policy was not even the same rider that was described in the Explanation of Benefits Report that Skryd provided to Gibbons before the Policy was issued, but a completely new and different rider altogether.

58.    In or about November 1997, as Gibbons' income grew, he sought additional income protection.  So, once again, Skryd, as MONY's agent, and MONY's underwriters conducted another extensive application and underwriting review process resulting in higher premium charged to Gibbons and the Policy's basic monthly benefits being increased to $9,869.00.

59.    In a letter dated June 19, 2002, Skryd wrote to Gibbons and confirmed that the Policy's "Benefit Period is: Lifetime Sickness and Accident."  A true and correct copy of Skryd's June 19, 2002 letter is attached hereto as <u>Exhibit E</u>.

60.    Gibbons and MONY Agent Skryd communicated often from early January 1990 through this date to make sure Gibbons family disability policy and other MONY life insurance policies were current and options offered by MONY were evaluated for the benefit of Gibbons' family needs.

61.     Virtually all written correspondence and oral communications from MONY Agent Skryd were initiated from Jack Skryd's MONY offices in DuPage County, Illinois.

62.     At all relevant times during the solicitation, sales, negotiation, and application process, MONY Agent Skryd's intent was to procure, bind, and place on PLAINTIFF's behalf the most comprehensive lifetime benefit coverage MONY offered, which he believed was the "Lifetime Injury and Sickness Benefit Rider," which Skryd had described to PLAINTIFF in the Explanation of Benefits Report.  Confirmation of MONY Agent Skryd's role and intent in procuring, binding, and placing the Policy on PLAINTIFF's behalf is set forth in the Affidavit of John A. Skryd dated June 10, 2015, and attached hereto as Exhibit F.

**B.     Gibbons' Disability Claim**

63.     On April 6, 2013, Gibbons suffered a stress-induced heart attack and was transported to a hospital by life support emergency rescue where he underwent heart surgery, including the implantation of two heart stints.  Gibbons remained in the Intensive Care Unit ("ICU") for three days following his surgery.

64.     There was absolutely no warning or evidence of cardiovascular sickness or disease prior to the April 6, 2013 heart attack.

65.     Shortly after being released from the hospital, Gibbons contacted Skryd and placed him, as MONY's agent, on notice of his heart attack and potential disability claim.

66.     Because his Government Relations firm, which Gibbons was founder and president, was very busy at the time, Gibbons accelerated his return to work, after a short recuperative period, to address the many stressful demands of running his firm, his cancer research clients with significant fiscal issues pending before the United States Congress, and a

major evolving case that he was instrumental in initiating by the United States against the Government of Argentina in the World Trade Organization (WTO) in Geneva, Switzerland.

67.     On June 30, 2013, Gibbons suffered a second stress-induced heart attack, was again transported by emergency life support rescue to a hospital, and was again admitted to the ICU for testing and observation for three days.

68.     Gibbons' doctors advised him against returning to work as the stress was too great and could cause a future, potentially fatal, stress-induced heart attack.

69.     On or about August 5, 2013, Gibbons again contacted Skryd and placed him and MONY on notice that he would be seeking coverage under the Policy.

**C.      DMS' Bad Faith Claims Handling and Wrongful Denial of Lifetime Benefits**

70.     From the outset of its handling of Gibbons' claim, DMS was blatantly hostile about paying the disability claim and placed arbitrary and capricious obstacles in place in a deliberate effort not to pay Gibbons full Policy benefits.

71.     Via literally hundreds of pages of communications, DMS presented a moving target for coverage, purposeful delays, hostility, and complete unresponsiveness, leading to monthly insecurity on the part of Gibbons regarding the availability of his benefits, and exacerbating his already fragile emotional state of distress.

72.     For example, DMS attempted to add conditions found nowhere in the Policy and demanded excessive documentation regarding Gibbons' "Regular Occupation," despite the fact that Gibbons' employment had not changed since the first time the Policy was underwritten in 1990.  Regardless, Gibbons submitted an exhaustive "Occupational Duties" form to DMS.

73.     During this arduous process, DMS issued each disability check with a blatantly condescending and harassing caveat that such payments were being made as a "gesture of good

will," but were still subject to final determination. Essentially stating that Gibbons should go ahead and cash the check and that DMS would not require him to pay the money back.

74. This escalating punitive harassment reached its pinnacle on August 28, 2014, when DMS informed Gibbons that it was cancelling all Policy benefits due to Gibbons' alleged failure to cooperate in the claims investigation.

75. For over one year, DMS relentlessly harassed Gibbons to the point where his treating psychiatrist, Bruce A. Kehr, M.D. ("Kehr"), wrote a letter dated September 26, 2014, to the president and CEO of DMS, Robert Bonsall, Jr., notifying him that, in Kehr's medical opinion, and based upon a reasonable degree of medical certainty, he had great concerns about Gibbons' health if DMS continued to harass Gibbons and his family. A true and correct copy of Kehr's letter will be filed separately under seal.

76. DMS' aggressive and overly confrontational handing of Gibbons' claim has caused him great emotional distress, for which he continues to be treated to this day.

77. Only at the behest of Gibbons' counsel, did DMS continue to pay Gibbons' monthly benefits due and owing under the Policy through early 2015.

78. However, in a letter dated April 3, 2015, DMS denied Gibbons' request for "lifetime benefits" under the Policy, stating that Gibbons' stress-induced heart attack was by DMSs interpretation of the Policy not an "Injury" as that term is defined within the Policy.

79. Accordingly, DMS has indicated that Gibbons' disability benefit payments under the terms of the Policy will end on September 1, 2016.

## COUNT I – NEGLIGENCE

80. PLAINTIFF repeats and re-alleges paragraphs 1 through 79 above as though fully set forth herein.

14

81.     Defendant MONY, as the principal, as well as MONY's agent, Jack Skryd, owed Gibbons a duty to exercise ordinary care and skill to procure the "lifetime benefit" coverage that Gibbons specifically requested in his numerous communications with Skryd, including the explicit instructions contained in his May 14, 1990 letter.

82.     Both Skryd, as agent, and MONY, as principal, breached their respective duty to Gibbons by failing to include in the Policy the most comprehensive "lifetime benefit" rider available, as Gibbons specifically requested and was paid for in full by Gibbons for twenty-five (25) years.

83.     Skryd and MONY's breach of their respective duty to Gibbons by failing to provide him with comprehensive "lifetime benefit" coverage under the Policy is the direct and proximate cause of Gibbons' significant financial harm.

84.     But for Skryd and MONY's breach of their duty, Gibbons would not be facing significant financial harm in the form of having this Court determine whether there is "lifetime benefit" coverage under the Policy to replace his loss of income.

85.     As a direct and proximate result of Skryd and MONY's negligent conduct, Gibbons will suffer financial harm, most significantly after September 1, 2016, when MONY will act on its interpretation of the "lifetime benefit" provision and he ceases receiving the amount of $9,869 per month for the remainder of his lifetime.

86.     Gibbons neither caused, nor contributed in any way to, Skryd or MONY's negligent conduct that resulted in these potentially significant financial damages.

87.     Accordingly, the Court should award PLAINTIFF damages in an amount to be determined at trial, plus attorney fees and other relief as the Court deems just and proper.

## COUNT II – REFORMATION

88.     PLAINTIFF repeats and re-alleges paragraphs 1 through 87 above as though fully set forth herein.

89.     During the underwriting/application process, Skryd, while acting as MONY's Field Underwriter (Licensed Resident Agent), discussed many times with Gibbons, Gibbons' specific request for a lifetime benefit, and agreed that any disability policy that Skryd would sell to Gibbons had to and would have a comprehensive "lifetime benefit" rider as part of the coverage.

90.     The substance of the Policy rider that Skryd sold Gibbons, who was assured repeatedly by Agent Skryd would be for life time disability benefits was the "Lifetime Injury and Sickness Benefit Rider" that was set forth in the Explanation of Benefits Report and provided coverage as follows:

> This option is designed to help replenish what disabilities, caused by injury or sickness, take from your retirement, CASH.  It provides a guaranteed monthly income benefit beginning at age 65 and continuing for life if the coverage to which this rider is attached paid monthly income benefits during ages 60 through 64 for Incapacity and/or Residual Income Loss.
>
> The amount of your monthly income benefit, beginning at age 65, is determined by the amount of monthly income benefits paid by the coverage to which this rider is attached for disability during ages 60 through 64.
>
> You do not need to be disabled beyond age 65 to receive Lifetime Injury and Sickness Benefits.

91.     A significant variance exists between the language and coverage, understood and agreed to by Skryd and Gibbons, as set forth above, and the language and coverage afforded in the "Lifetime Benefit Extension Rider" which ultimately found its way into the Policy.

92.     MONY Agent Skryd, in his affidavit dated June 10, 2015, confirmed his intent to procure, bind, and place on PLAINTIFF's behalf, the most comprehensive lifetime benefit

coverage that MONY offered, which he believed, as MONY's leading Agent in the United

States, was the "Lifetime Injury and Sickness Benefit Rider," which Skryd described to

PLAINTIFF in the Explanation of Benefits Report.

93.     MONY Agent Skryd, in his affidavit, also confirmed that he called MONY

disability underwriting before making the "LPBER" notation, described Gibbons' repeated,

unequivocal requests for full lifetime benefits, and asked the underwriter with whom he spoke

which rider was appropriate to place onto the Policy.  The underwriter told him to "just put

LPBER" on the application.

94.     The MONY underwriters and/or administrative staff never confirmed which

"lifetime" rider MONY Agent Skryd requested, and mistakenly placed a more restrictive and less

comprehensive lifetime rider in the Policy, rather than the Lifetime Injury and Sickness Benefit

Rider specifically requested by Gibbons.

95.     As a result of this apparent clerical mistake, Gibbons will potentially suffer

significant financial damages.

96.     Accordingly, the Court should reform the Policy to include the "Lifetime Injury

and Sickness Benefit Rider" that Skryd and Gibbons agreed upon, but was mistakenly not

included in the Policy at the time of issuance.

97.     Pursuant to Federal Rule of Civil Procedure 8(a)(3) and 8(e)(2), PLAINTIFF

alleges Counts III and IV in the alternative.

## **COUNT III – DECLARATORY JUDGMENT**

98.     PLAINTIFF repeats and re-alleges paragraphs 1 through 97 above as though fully

set forth herein.

99.     Defendant DMS issued a denial of coverage letter dated April 3, 2015, in which it advised Gibbons under its interpretation of the Policy that his stress-induced heart attack was a "Sickness" and not an "Injury," as those terms are defined within the Policy, and therefore Gibbons "is not entitled to lifetime benefits."

100.    The term Injury is defined in the Policy to mean "accidental bodily injury sustained while this Policy is in force."

101.    The term Sickness is defined in the Policy to mean "sickness or disease which first manifests itself while this Policy is in force."

102.    There was absolutely no warning or evidence that Gibbons had any type of cardiovascular sickness or disease prior to his April 6, 2013 heart attack.

103.    Gibbons' stress-induced heart attacks were completely unexpected and unintended, and arose directly from his high-pressure work environment and the stress he was under as president of one of Washington's oldest, independent, public policy and government relations firms, and as such his heart attacks were an accidental result and a consequence of his chosen profession, and not caused by any pre-existing "sickness or disease."

104.    It follows that Gibbons' "Incapacity" under the Policy was caused by a work-related Injury and not a Sickness or disease.

105.    Because DMS' denial letter is based upon the faulty and convenient presumption that Gibbons' Incapacity was due to a Sickness, an actual controversy exists requiring this Court to determine whether MONY is liable to Gibbons to continue to make disability payments under the Policy for his lifetime.

106. Accordingly, PLAINTIFF respectfully requests that this Court enter a declaratory judgment against Defendants, declaring the respective rights, statuses, and legal obligations of PLAINTIFF and Defendants, and holding as follows:

    a.     Gibbons' stress-induced heart attacks that caused his Incapacity were the result of an Injury as that term is defined within the Policy; and

    b.     MONY is liable to provide Gibbons with lifetime benefits under the Policy.

## COUNT IV – BREACH OF CONTRACT

107. PLAINTIFF repeats and re-alleges paragraphs 1 through 106 above as though fully set forth herein.

108. On or about September 1, 1990, MONY issued the Policy to Gibbons.

109. Gibbons has paid on time all monthly premiums on the Policy and otherwise performed and complied with all terms and conditions in the Policy.

110. The Policy entitles Gibbons to lifetime benefits coverage for Incapacity due to Injury that commenced prior to age 65.

111. Gibbons' stress-induced heart attacks are an Injury as defined within the Policy.

112. Defendants have breached the Policy with Gibbons by denying his lifetime benefits coverage and refusing to extend his disability benefits past age 65.

113. Accordingly, PLAINTIFF respectfully requests that judgment be entered against Defendants in an amount to be proven at trial and for any other relief this Court deems just and proper.

## COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS

114. PLAINTIFF repeats and re-alleges paragraphs 1 through 113 above as though fully set forth herein.

115.    Defendant DMS' deliberate vexatious conduct in the administration of Gibbons' claim for disability benefits under the Policy was and is extreme, reprehensible and outrageous, as is evidenced by its continuous and repeated mischaracterizations of Policy provisions as well as its threats to cut off benefits if Gibbons does not cooperate with its unreasonable demands outside the scope of the terms of the Policy.

116.    DMS either intended to inflict severe emotional distress or knew that there was a high probability that its conduct would do so.

117.    DMS had actual knowledge of the severe emotional distress its conduct was causing to Gibbons because DMS' in-house experts had access to Gibbons' medical and psychological records.

118.    DMS' outrageous conduct actually caused Gibbons severe emotional distress, including increased thoughts of suicide, for which Gibbons continues to seek psychiatric treatment today.

119.    Accordingly, PLAINTIFF respectfully requests that judgment be entered against Defendants in an amount to be proven at trial and for any other relief this Court deems just and proper.

## JURY DEMAND

PLAINTIFF hereby respectfully demands a trial by jury of all issues so triable pursuant

to Rule 38 of the Federal Rules of Civil Procedure.


Respectfully submitted,

Clifford Sam Gibbons

Dated: June 17, 2015                    By: /s/ Joseph L. Pellis II
                                           Joseph L. Pellis II
                                           Attorney No. 6298127
                                           PELLIS LAW GROUP, LLP
                                           901 Warrenville Road, Suite 205
                                           Lisle, IL 60532
                                           t: +1 (630) 442-5500
                                           f: +1 (630) 442-5519
                                           jpellis@pellislaw.com

                                           *Attorney for the Plaintiff*

## VERIFICATION

I, Clifford Sam Gibbons, declare as follows:

1.     I am the Plaintiff in the present case and a citizen of the United States of America.

2.     I have reviewed the foregoing *Verified Complaint for Declaratory and Other Relief*.

3.     I have personal knowledge of myself, my activities, and my intentions, including those set out in the foregoing *Verified Complaint for Declaratory and Other Relief*, and if called on to testify I would competently testify as to the mattes stated herein.

4.     I have reviewed the allegations of which I do not have personal knowledge and believe them to be true based on the specified information, documents, or both.

5.     Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the factual statements in this *Verified Complaint for Declaratory and Other Relief* concerning myself, my activities, and my intentions are true and correct.

Executed on _June 17_, 2015.

Clifford Sam Gibbons