IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CLIFFORD SAM GIBBONS, | ) |
| Plaintiff, | ) ) ) |
| vs. | ) Case No. 15 C 5352 ) |
| MONY LIFE INSURANCE COMPANY and DISABILITY MANAGEMENT SERVICES, INC., | ) ) ) ) |
| Defendants. | ) ) |

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

In June 2015, Clifford Sam Gibbons sued MONY Life Insurance Company and Disability Management Services, Inc. (DMS) after being denied benefits under his disability insurance policy. By October 2016, the Court had either dismissed as time-barred or granted summary judgment for the defendants on four of Gibbons's five claims, leaving only a claim for intentional infliction of emotional distress (IIED). In March 2017, the Court granted the defendants' motion to enforce a subsequent oral settlement agreement between the parties and dismissed the remaining claim with prejudice, over Gibbons's objection that he did not authorize his then-attorney, Joseph Pellis, to enter into a settlement. Gibbons then moved for relief from judgment under Federal Rule of Civil Procedure 60(b). The Court denied the motion in part and ordered an evidentiary hearing on the remaining issues. The hearing took place on September 8, 2017. For the reasons stated below, the Court denies the remainder of Gibbons's

motion for relief from judgment.

**Background**

The factual background of this case is discussed in a number of prior opinions. *See Gibbons v. MONY Life Ins. Co.*, No. 15 C 5352, 2017 WL 3421475 (N.D. Ill. Aug. 9, 2017); *Gibbons v. MONY Life Ins. Co.*, 208 F. Supp. 3d 925, 927 (N.D. Ill. 2016). The Court briefly summarizes the facts and procedural history relevant to the remaining issues in Gibbons's Rule 60(b) motion below and as necessary throughout this opinion.

After the Court disposed of all of Gibbons's claims with the exception of his IIED claim, defense counsel and Pellis engaged in settlement discussions. In a January 15, 2017 e-mail to Gibbons, on which his wife, Terri Gibbons (Terri), was copied, Pellis informed Gibbons that defense counsel "has offered us their max settlement of $40K and they will waive pursuing any costs to dismiss" the remaining claim.[1] Defs.' Post-Hr'g Br., Ex. 2 at 5. Pellis recommended to Gibbons that he accept the proposed settlement. *Id.* Gibbons responded to Pellis the same evening via e-mail, again copying Terri. Gibbons told Pellis that "[t]his is a bitter pill to swallow," and that he needed 24 hours "to reflect on [Pellis's] sound judgment." *Id.* at 4-5. Gibbons asked to set up a brief call between Pellis, Terri, and himself the following day. He stated, "I am not sure whether Terri and I will be in the same place and she definitely wants to be on the phone." *Id.* at 5. Gibbons closed the e-mail by asking, "I guess the bottom line with this insulting settlement offer is it enough to cover your fees?" *Id.*

In a January 16 e-mail to Pellis, on which Gibbons does not appear to be copied,

---

[1] The Court previously ruled that Gibbons waived his attorney-client privilege with respect to this e-mail and the other e-mails discussed in this opinion. *Gibbons*, 2017 WL 3421475, at *5.

Terri told Pellis that she did not think there was a need to waste his time with another conference call. *Id.* at 3. On January 18, Pellis e-mailed Terri and asked "[c]an you confirm whether you and Cliff are willing to accept the settlement offer?" *Id.* at 2. Pellis told Terri in that e-mail that "[c]ounsel for MONY has indicated we have until Friday the 20th to accept the offer." *Id.* On January 19, at approximately 1:00 PM,[2] Terri responded, "It appears we have no other choice." *Id.* She instructed Pellis to "[s]end us the necessary paperwork to sign and enable both parties to move on and officially end the relationship." *Id.* Terri appears to have forwarded that portion of her correspondence with Pellis to Gibbons at 3:00 PM that same day. *Id.* at 1-2. At 6:09 PM on January 19, Pellis informed defense counsel via e-mail that Gibbons would accept the settlement offer. Defs.' Post-Hr'g Brief, Ex. 1 at 1.

Later that evening, at 11:49 PM, Gibbons e-mailed Pellis, again copying Terri. In that e-mail, Gibbons told Pellis "[t]his settlement offer is all in your court at this stage." Defs.' Post-Hr'g Brief, Ex. 2, at 1. Gibbons further stated, "I would suggest you give it all you can with this ----- representing MONY/DMS. Whatever you can best negotiate is it." *Id.* He went on, "I would like only one thing at this stage and it cost [sic] no money. I want as a part of any settlement a certified letter from a C-level MONY executive that the four life insurance policies I have with MONY do not have the same spring trap of fraudulence that had [sic] been revealed in this case." *Id.* Finally, Gibbons stated, "So the bottom line is Joe – negotiate your best deal with these [redacted]. Because this is

---

[2] Gibbons and Pellis were not in the same time zone on January 19, 2017. Not all of the e-mail timestamps specify a time zone, and it appears that some refer to Mountain Standard Time (MST) and some refer to Central Time (CT), which is an hour ahead of MST. The Court need not engage in speculation as to what time zone corresponds to each e-mail because the hour difference between MST and CT is not material.

3

all you are getting . . . ." *Id.*

In February 2017, Pellis informed defense counsel that Gibbons had changed his mind after reviewing the settlement agreement. Defendants then filed a motion to enforce the parties' agreement. During a March 2017 hearing on the motion, Gibbons appeared along with Pellis, and he stated that he never agreed to settle the case. The Court found that the January 2017 exchange of e-mails between defense counsel and Pellis, acting as Gibbons's agent, constituted an enforceable agreement. The Court granted defendants' motion to enforce and dismissed the case with prejudice in late March 2017 upon defendants' tender of the agreed-upon payment to Gibbons.

In May 2017, Gibbons filed a motion for relief from judgment requesting relief not only from the Court's order enforcing the settlement agreement, but also from the partial grant of summary judgment in favor of defendants on two of his claims. The Court denied the motion with respect to the summary judgment ruling. With respect to the order enforcing settlement, the Court denied Gibbons's motion to the extent that it was based on a claim of fraud or misconduct by defendants, but it ordered an evidentiary hearing on three issues relevant to the question of whether Pellis erred or acted with excusable neglect when he accepted the proposed settlement on Gibbons's behalf:

(1) whether Pellis had authority from Gibbons to accept the proposed settlement before Pellis communicated that acceptance to defense counsel;

(2) whether Gibbons's wife Terri gave Pellis authority to accept the proposed settlement; and

(3) whether Gibbons subsequently ratified the acceptance.

4

Gibbons contends that he did not give Pellis express authorization to accept the proposed settlement on his behalf and that he never gave Terri authority to tell Pellis to accept. Gibbons further contends that he did not ratify the acceptance of the proposed settlement but instead asked Pellis to make a counteroffer. Gibbons argues that Pellis's acceptance of the settlement without his consent constituted mistake or excusable neglect warranting relief under Rule 60(b)(1).

## Discussion

Rule 60(b)(1) provides that a court may relieve a party from a final judgment, order, or proceeding based on "mistake, inadvertence, surprise, or excusable neglect." Fed. R. Civ. P. 60(b)(1). Relief under Rule 60(b) is an "extraordinary remedy" that is granted "only in exceptional circumstances." *Eskridge v. Cook County*, 577 F.3d 806, 809 (7th Cir. 2009) (citation omitted).

An attorney may not settle a case on behalf of a client without the express authority of the client. *See, e.g.*, *Bradford Exch. v. Trein's Exch.*, 600 F.2d 99, 102 (7th Cir. 1979) (per curiam) ("An attorney may not consent to a final disposition of his client's case without express authority."); *City of Des Plaines v. Sci. Mach. Movers, Inc.*, 9 Ill. App. 3d 438, 444, 292 N.E.2d 154, 158 (1972) (it is an "established rule of law that an attorney . . . has no authority to compromise, to give up any right of his client, or to consent to judgment against his client without the express consent or authorization of that client").

Gibbons appears to argue in his post-hearing brief that, because he did not expressly authorize Pellis to accept the proposed settlement, Pellis could not appropriately accept the settlement, and that is the end of the matter. Defendants

contend, on the other hand, that an agent of the client can provide the express consent necessary to authorize an attorney to accept a proposed settlement if the client's agent has the actual or apparent authority to do so. Specifically, Defendants contend that Terri expressly authorized Pellis to accept the settlement and that she had both actual and apparent authority to instruct Pellis to do so on Gibbons's behalf. Gibbons maintains that he never gave Terri express or other implied authority to tell Pellis to accept the proposed settlement and that Terri's e-mail to Pellis did not give him express authority to accept.

An agent has express authority when the principal explicitly grants him the authority to perform a particular act. *Lydon v. Eagle Food Ctrs., Inc.*, 297 Ill. App. 3d 90, 94, 696 N.E.2d 1211, 1215 (1998). Because there is no evidence that Gibbons himself expressly authorized Pellis to accept the proposed settlement prior to Pellis doing so, the first question the Court must address is whether Terri's January 19 e-mail to Pellis expressly authorized him to agree to the settlement. In response to a direct question from Pellis (by e-mail) asking whether she and Gibbons were willing to accept the soon-to-expire settlement offer, Terri stated "[i]t appears we have no other choice," and she instructed Pellis to send them the necessary paperwork. Defs.' Post-Hr'g Br., Ex. 2 at 2. The Court finds that Terri's January 19 e-mail to Pellis, as described above, expressly authorized him to accept the proposed settlement.

The next question is whether Terri had the authority to act as Gibbons's agent in this context such that her grant of express authority to Pellis to settle the case is binding on Gibbons himself. Illinois courts have recognized that a client's spouse may act as the client's agent in interactions with an attorney and have applied traditional principles

of agency law in that context.  In *Lama v. Preskill*, 353 Ill. App. 3d 300, 305-06, 818 N.E.2d 443, 449 (2004), the appellate court observed that, for purposes of an attorney-client privilege determination, the trial court implicitly found that the plaintiff's husband had acted as her agent in a particular meeting with an attorney.  Although the issue of agency was not before the court because the plaintiff did not dispute it on appeal, the court explained that "[w]hen an agent communicates with the principal's attorney, the agent speaks as the client, or principal, and his or her communications are protected to the same extent as though the principal was speaking."  *Id.* at 306, 818 N.E.2d at 449.  The court further noted that the record supported the conclusion that the plaintiff's husband had acted as her agent during the relevant meeting with the attorney.  *Id.*

There is no presumption that one spouse has the authority to act for the other.  *Curto v. Illini Manors, Inc.*, 405 Ill. App. 3d 888, 891-92, 940 N.E.2d 229, 232 (2010).  The agency of a spouse is a question of fact, and the party claiming an agency relationship must prove the existence of such a relationship by a preponderance of the evidence.  *Id.*  An agent's authority to act on behalf of the principal may be either actual or apparent.  *Patrick Eng'g, Inc. v. City of Naperville*, 2012 IL 113148, ¶ 34, 976 N.E.2d 318, 329.  Actual authority may be either express or implied; implied authority is proven circumstantially by evidence of the agent's position.  *Id.*  Apparent authority exists "when the principal, through words or conduct, creates a reasonable impression that the agent has authority to perform a certain act."  *Lydon*, 297 Ill. App. 3d at 95, 696 N.E.2d at 1216 (internal quotation marks and citations omitted); *see also Patrick Eng'g*, 2012 IL 113148, ¶ 34, 976 N.E.2d at 329 (apparent authority "is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's

7

conduct, would naturally suppose the agent to possess"). An agent's authority may be presumed from the alleged principal's silence when he knowingly allows another to act for him as his agent. *Mateyka v. Schroeder*, 152 Ill. App. 3d 854, 864, 504 N.E.2d 1289, 1295 (1987). The scope of an agent's authority is what "persons of reasonable prudence, ordinarily familiar with business practices, in dealing with the agent might rightfully believe him to possess, based on the principal['s] conduct." *Id.*

Although Terri is not a party to the lawsuit, the evidence shows that from the outset, she was an active participant in the suit and, in particular, in dealings with counsel about the suit, and that Gibbons was aware of this. The September 2014 engagement letter, which is titled "Legal Services Engagement Agreement between Cliff and Terri Gibbons and Pellis Law Group, LLP," is signed by both Gibbons and Terri. Defs.' Post-Hr'g Br., Ex. 5. The first sentence of the letter states, "Per our telephone conversation today with me and my law partner Daniel Lavoie, we are pleased that you have given Pellis Law Group . . . the opportunity to represent *you and your husband* in pursuing Mutual of New York ("MONY") for insurance coverage under Cliff's disability policy with MONY." *Id.* at 1 (emphasis added). Gibbons nonetheless testified at the evidentiary hearing that Terri was not Pellis's client, that it was his case and his life insurance policy at issue, and that Terri merely assisted him when he was too "physically impaired and psychologically impaired to handle" the volume of correspondence he received from defendants. Evid. Hr'g Tr. 32:20-24. Pellis, by contrast, testified that he understood both Gibbons and Terri to be his clients. *Id.* 59:22. Although no clause in the engagement letter so states, Pellis also testified that he understood the engagement letter to authorize Terri to act for Gibbons in connection

with the lawsuit and that this is why he had both of them sign it. *Id.* 50:10-15. Pellis stated that when he first met with the Gibbonses, Terri represented that Gibbons "had some diminished capacity and also severe agitation caused by Mony [sic] in this whole process and that she wanted to, just as she had intervened with Mony, sort of take the point on [sic] taking it off of [Gibbons's] plate." *Id.* 50:15-20. Pellis also testified to the following "pattern" of communication that emerged during his relationship with the Gibbonses:

> [W]e'd start a conversation, and then Terry [sic] would just email me, cut Cliff off, and then she would forward that communication afterwards at what point she felt was okay, you know, based on how he felt at that time. . . . So that was not uncommon that she would drop him off of the email flow.

*Id.* 52:12-21.

A December 2016 e-mail exchange between Pellis and Terri provides additional support for Pellis's testimony. On December 1, 2016, Pellis sent an e-mail to Terri that stated, in relevant part, "I understand and agree. Do I have your approval and consent to continue the negations [sic] on settling with MONY?" Defs.' Post-Hr'g Br., Ex. 7. The e-mail, which Pellis appears to have written in response to a previous e-mail from Terri, is addressed solely to her. Terri's December 5 response, which is addressed only to Pellis, states the following: "Absolutely you have our approval and consent to continue negotiations on settling with MONY. I totally agree with your goal. Let me know if there is anything I need to provide to assist you and keep me posted." *Id.*

At the very least, the evidence supports defendants' contention that Terri had apparent authority to authorize Pellis to accept the proposed settlement on Gibbons's behalf. First, Gibbons, along with Terri, signed an engagement letter that repeatedly

9

refers to Terri and Gibbons together, as if they were both considered clients of the firm. Additionally, in his January 15, 2017 e-mail to Pellis, Gibbons himself acknowledged and appeared to affirm Terri's ongoing involvement in the case (and, specifically, the settlement negotiations) by asking to use a call-in conference number to speak to Pellis about the settlement proposal; he was not sure whether he and Terri would be in the same place, and he knew that Terri "definitely wants to be on the phone." Defs.' Post-Hr'g Br., Ex 2 at 5. Gibbons does not appear to have objected at any point to Pellis copying Terri on their communications, and, indeed, he also copied Terri on his e-mails to Pellis. *See id.* at 1, 4. Nor does Gibbons appear to have objected to the course of conduct described by Pellis, in which Terri would respond to Pellis's e-mails without copying Gibbons and forward the communications to Gibbons at a later date.

Gibbons testified that Terri did not share with him many of the e-mails between Terri and Pellis and that he was "shocked" when he first saw them. Evid. Hr'g Tr. 21:14-18. As previously noted, however, Terri did forward the January 19, 2017 e-mail in which she expressly authorized Pellis to accept the proposed settlement, sending the e-mail to Gibbons that same afternoon. Defs.' Post-Hr'g Br., Ex 2 at 1-2. The Court also notes that if Terri somehow went behind Gibbons's back in communicating with Pellis at any point, it stands to reason that Gibbons could have elicited that fact had he called Terri to testify under oath at the evidentiary hearing as the Court suggested. Because, however, Gibbons declined to call Terri as a witness on the ground that she is not a party to the case, the only testimony to that effect is Gibbons's own, and the Court finds it lacks credibility in light of the other available evidence.

Lastly, in the e-mail Gibbons sent to Pellis on the evening of January 19, 2017

10

(several hours after Terri had forwarded Gibbons a copy of her own January 19 e-mail to Pellis), Gibbons in no way objected to Pellis's and Terri's prior communication, nor did he indicate that Terri was not authorized to tell Pellis to accept the settlement proposal. *Id.* at 1. Furthermore, when Gibbons was asked at the evidentiary hearing whether he ever told Pellis via phone or e-mail between January 19, 2017 and approximately January 25, 2017, when he saw the settlement agreement, that Terri did not have authority to approve the settlement, Gibbons could say only that he did not remember. Evid. Hr'g Tr. 40:5-14.

Despite Gibbons's testimony to the contrary, the circumstantial evidence in this case supports a finding that Terri had implied actual authority to tell Pellis to accept the proposed settlement on Gibbons's behalf. When viewed in its entirety, the evidence also shows that Gibbons's own words and conduct created a reasonable impression that, as Gibbons's agent, Terri had the authority to expressly authorize Pellis to accept the proposed settlement. Pellis reasonably relied on Terri's authority when he accepted the settlement.

For these reasons, the Court concludes that Pellis did not err or commit excusable neglect in accepting the proposed settlement agreement with MONY. Relief from the order enforcing settlement is therefore unwarranted under Rule 60(b)(1).

## Conclusion

For the foregoing reasons, the Court denies the remainder of Gibbons's Rule 60(b) motion for relief from the March 2017 order enforcing the settlement [dkt. no. 128].

October 25, 2017

                                      MATTHEW F. KENNELLY
                                      United States District Judge